*In re* APPLICATIONS OF DETROIT EDISON COMPANY

Docket Nos. 296374 and 296379. Submitted October 4, 2011, at Lansing. Decided April 10, 2012, at 9:00 a.m.

Detroit Edison Company filed applications in the Public Service Commission (PSC), requesting authority to realign retail electric rates for Michigan educational institutions to recover the resultant revenue shifts to other customer classes and a rate increase above the established retail electric base rates. In addition, Detroit Edison requested that the PSC continue the company's choice incentive mechanism (CIM), its storm-restoration expense recovery mechanism, and the line-clearance expense recovery mechanism, authorize the implementation of an uncollectible expense true-up mechanism (UETM), approve a revenue decoupling mechanism (RDM), and approve its proposal to amend or extend certain retail electric rate schedules. The Association of Businesses Advocating Tariff Equity (ABATE) and the Attorney General intervened. Following an evidentiary hearing, the PSC authorized Detroit Edison to adopt an RDM, authorized Detroit Edison to include $39,858,000 in funding for the Low-Income and Energy Efficiency Fund (LIEEF) as an operation and maintenance expense, approved four single cost tracking mechanisms, and approved funding for Detroit Edison to pursue a plan to upgrade its meters. ABATE and the Attorney General appealed separately.

The Court of Appeals *held*:

1. An administrative agency's powers are limited to those granted by the Legislature by clear and unmistakable language. Although MCL 460.1089(6) mandates that qualified natural gas providers may use an RDM to adjust for sales volumes above or below the projected levels, MCL 460.1097(4) does not mandate or authorize the use of an RDM by electricity providers. Rather, MCL 460.1097(4) mandates research and reporting on how RDMs would operate in connection with electricity providers. The PSC did not have authority to authorize Detroit Edison's adoption of an RDM.

2. PSC regulated utilities are not required to raise money for the LIEEF because its enabling legislation was deleted from the Customer Choice and Electricity Reliability Act, MCL 460.10 *et seq*. The PSC does not have authority under the general regulatory

powers provided in MCL 460.6a(2) to approve a utility's collecting money from its ratepayers as an operation and maintenance expense to fund a program to help ratepayers who have difficulty paying their energy bills or to administer a program to promote energy efficiency in general. The PSC erred by approving Detroit Edison's petition to collect nearly $40 million in LIEEF funding from its customers because Detroit Edison lacked statutory authority to collect money for such a purpose.

3. Retroactive ratemaking is prohibited without statutory authorization, but it does not occur if only future rates are affected with no adjustment to previously set rates. The PSC may use the accounting convention by which storm-related expenses from one year are characterized as expenses incurred in subsequent years to which they were deferred. The PSC had authority to approve Detroit Edison's request to extend previously approved trackers for storm and nonstorm restoration expenses and a line-clearance expense mechanism, to adopt a UETM, and to continue a CIM. The PSC correctly approved Detroit Edison's use of tracking mechanisms though which future rates are adjusted to take account of actual past expenses.

4. The PSC may allow recovery of a utility's costs only when the utility proves that recovery of the costs is just and reasonable. The PSC erred by approving a nearly $37 million rate increase to fund Detroit Edison's advanced metering infrastructure (AMI) program, which involved so-called "smart meters" to collect real-time energy consumption data, because the decision was not supported by competent, material, and substantial evidence on the whole record. The AMI program was commercially untested and highly capital intensive, with a potential for significant economic risk and substantial impact on rates. Detroit Edison failed to present evidence regarding a cost-benefit analysis of the program or its necessity, as well as the availability of other competing considerations. Even though Detroit Edison characterized the program as experimental, an abuse-of-discretion standard of review was not appropriate, regardless of the difficulty with establishing a cost-benefit analysis for a pilot program. Remand was necessary for the PSC to conduct a full hearing on the program.

5. The Legislature intends specificity in a statute when the language is specific and silence when it is silent. Under MCL 460.11(1), as amended by 2008 PA 286, the cost of providing electricity to customers is calculated by an allocation formula of 50 percent weighting of peak demand, 25 percent weighting of on-peak energy use, and 25 percent weighting of total energy use. Because the Legislature specified the 50-25-25 weighting formula

with no indication about how the components should be calculated, the Legislature intended to prescribe the weighting formula while leaving the PSC and the utilities to determine which formula to use to calculate the individual components in the normal course of business. Thus, the PSC properly allowed Detroit Edison to calculate the peak demand component by using the MH4CP method, as opposed to using the 12CP method that was in effect when MCL 460.11(1) was amended and the weighting formula was set.

Affirmed in part, reversed in part, and remanded for further proceedings.

SHAPIRO, P.J., concurring in part and dissenting in part, agreed with the majority that the PSC did not have authority to allow rate decoupling. The AMI program was experimental, so an abuse-of-discretion standard of review applied and Judge SHAPIRO would have affirmed the PSC's decision to approve Detroit Edison's AMI program because it was not arbitrary and capricious. Judge SHAPIRO concurred with the majority on all other issues.

1. PUBLIC UTILITIES — ELECTRIC UTILITIES — RATE-DECOUPLING MECHANISM — PUBLIC SERVICE COMMISSION — AUTHORITY TO ORDER RATE DECOUPLING.

The Public Service Commission does not have authority to approve or direct the use of a rate-decoupling mechanism by electric providers to adjust for sales volumes above or below projected levels (MCL 460.1097[4]).

2. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — LOW-INCOME AND ENERGY EFFICIENCY FUND — SOURCE OF FUNDING.

Utilities regulated by the Public Service Commission (PSC) are not required to raise money for the Low-Income and Energy Efficiency Fund because its enabling legislation was deleted from the Customer Choice and Electric Reliability Act, MCL 460.10 *et seq.*; under its general regulatory powers provided in MCL 460.6a(2), the PSC does not have authority to approve a utility's collecting money as an operation and maintenance expense from its ratepayers to fund a program to help ratepayers who have difficulty paying their energy bills or to administer a program to promote energy efficiency in general.

3. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — EXPERIMENTAL PROGRAMS — STANDARD OF REVIEW.

The Public Service Commission's approval of a utility's experimental program is not reviewed for an abuse of discretion; rather, recovery of the experimental program's costs must be just and reasonable and the commission's approval must be supported by

competent, material, and substantial evidence on the whole
record; competing program considerations, the necessity of the
program, and an analysis of the cost of the program versus the net
benefit to the customer must all be considered.

4. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — ELECTRIC RATES —
   COST-ALLOCATION FORMULA — COMPUTATION OF COMPONENTS.

   Under MCL 460.11(1), electricity providers must calculate the cost
   of providing service to each customer class through the allocation
   of production-related and transmission costs on the basis of a
   weighted formula of 50 percent peak demand, 25 percent on-peak
   energy use, and 25 percent total energy use; because the Legisla-
   ture specified the 50-25-25 weighting formula but was silent about
   how the individual components should be calculated, the Public
   Service Commission has authority in the normal course of busi-
   ness to determine how those components are calculated.

*Clarke Hill PLC* (by *Robert A. W. Strong*) for the
Association of Businesses Advocating Tariff Equity.

*Bill Schuette*, Attorney General, *John J. Bursch*,
Solicitor General, *Richard A. Bandstra*, Chief Legal
Counsel, and *Steven D. Hughey*, *Kristin Smith*, *Spencer
A. Sattler*, and *Anne M. Uitvlugt*, Assistant Attorneys
General, for the Public Service Commission.

*Fahey Schultz Burzych Rhodes PLC* (by *Stephen J.
Rhodes* and *William K. Fahey*), *Bruce R. Maters*, *Jon P.
Christinidis*, *Richard P. Middleton*, and *Michael J. Solo,
Jr.*, for The Detroit Edison Company.

*Bill Schuette*, Attorney General, *S. Peter Manning*,
Division Chief, and *Donald E. Erickson*, Assistant At-
torney General, for the Attorney General.

Before: SHAPIRO, P.J., and SAAD and BECKERING, JJ.

SAAD, J. In these consolidated appeals, appellants, the
Association of Businesses Advocating Tariff Equity
(ABATE) and the Attorney General, appeal the January

11, 2010, opinion and order of the Public Service Commission (PSC). For the reasons set forth, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. FACTS AND PROCEEDINGS

The PSC's opinion and order contains the following statement of facts:

> On January 5, 2009, The Detroit Edison Company . . . filed an application in Case No. U-15751 requesting authority to realign retail electric rates for Michigan educational institutions in accordance with the requirements of Section 11(4) of 2008 PA 286 (Act 286) [MCL 460.11(4)]. Detroit Edison stated that realigning rates for educational institutions necessarily shifts revenues to other customer classes. In its application, Detroit Edison requested to immediately implement surcharges to recover that revenue shift, or in the alternative, that the Commission authorize surcharges to recover that revenue shift, or in the alternative, that the Commission authorize establishment of a regulatory asset to account for the revenue shift.[1]

> On January 26, 2009, Detroit Edison filed an application in Case No. U-15768 requesting a $378 million rate increase above the retail electric base rates established in the December 23, 2008 and January 13, 2009 orders in Case No. U-15244 and pursuant to various special contracts approved by the Commission. Detroit Edison asserted that its request for rate relief was based on July 2009 through June 2010 test year data that establishes a need for additional revenue to cover environmental compliance costs; the costs associated with the operation and maintenance of the company's electric distribution system and generation plants; the costs associated with customer uncollectible accounts; the costs associated with inflation; the capital costs associated with the addition of plant; and to recognize the reduction in territory sales.

> In addition, Detroit Edison requested that the Commission continue the company's choice incentive mechanism

(CIM), its storm restoration expense recovery mechanism, and the line clearance expense recovery mechanism, with some modifications. Detroit Edison also requested Commission authorization to implement an uncollectible expense true-up [or tracking] mechanism (UETM), and requested that the Commission approve a revenue decoupling mechanism (RDM) proposed by the company. Detroit Edison requested that the Commission approve its proposal to amend or extend certain retail electric rate schedules, including its economic development tariff.

\* \* \*

According to Detroit Edison, under its current rate structure, full-service commercial and industrial (C&I) customers pay rates that are in excess of their cost of service while residential customers pay rates that are less than their cost of service. Detroit Edison notes that the Commission addressed this inequity in its December 23, 2008 order in Case No. U-15244, by ordering an immediate partial realignment of residential rates and by ordering annual rate realignments over a period of five years. Detroit Edison states that the rates proposed in this filing reflect the realignment ordered by the Commission for 2008.

---

[1] On February 3, 2009, the Commission issued an order in Case No. U-15751 in which it directed that all issues related to Detroit Edison's educational tariff filing should be addressed in Case No. U-15768.

---

Ultimately, the PSC issued an opinion and order that authorized Detroit Edison to adopt an RDM, allowed Detroit Edison to include $39,858,000 in funding for the Low-Income and Energy Efficiency Fund (LIEEF) as an operation and maintenance expense, approved four single cost tracking mechanisms intended to adjust future rates to make up for any difference between the amount for a particular item included in base rates and the actual cost experienced by the utility, and approved

funding for Detroit Edison to pursue a plan to upgrade its meters. ABATE also challenges the PSC's decision to change its methodology for calculating the peak-demand component for purposes of allocating production-related and transmission costs to customer classes in accord with a statutory formula.

## II. STANDARD OF REVIEW

As this Court explained in *In re Application of Michigan Consol Gas Co to Increase Rates*, 293 Mich App 360, 365; 810 NW2d 123 (2011):

> All rates, fares, charges, classifications, joint rates, regulations, practices, and services prescribed by the PSC are presumed prima facie to be lawful and reasonable. MCL 462.25; see also *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635–636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of showing by clear and satisfactory evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999).

> A final order of the PSC must be authorized by law and supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Consumers Energy Co*, 279 Mich App 180, 188; 756 NW2d 253 (2008). A reviewing court gives due deference to the PSC's administrative expertise and is not to substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999).

> Issues of statutory interpretation are reviewed de novo. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 102; 754 NW2d 259 (2008). A reviewing court should give an administrative agency's interpretation of statutes it is obliged to execute respectful consideration, but not deference. *Id.* at 108.

Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

### III. RATE DECOUPLING MECHANISM

We hold that the PSC exceeded its statutorily granted authority when it authorized Detroit Edison to adopt an RDM.

For purposes of this appeal, appellants do not dispute the policy objectives or expected consequences of Detroit Edison's adoption of an RDM, nor is it the judiciary's province to examine them. Rather, appellants correctly take issue with the PSC's authority to authorize the RDM in the first instance. Appellants point to the obvious differences in statutes addressing the use of RDMs for gas and electric utilities and reason, correctly in our view, that those differences mean that the PSC has authority to direct or approve the use of RDMs only in connection with gas utilities, not electric.

MCL 460.1089(6) states:

> The commission shall authorize a natural gas provider that spends a minimum of 0.5% of total natural gas retail sales revenues, including natural gas commodity costs, in a year on commission-approved energy optimization programs to implement a symmetrical revenue decoupling true-up mechanism that adjusts for sales volumes that are above or below the projected levels that were used to determine the revenue requirement authorized in the natural gas provider's most recent rate case. In determining the symmetrical revenue decoupling true-up mechanism utilized for each provider, the commission shall give deference to the proposed mechanism submitted by the provider. The commission may approve an alternative mechanism if the commission determines that the alternative mechanism is reasonable and prudent. The commission shall authorize the natural gas provider to decouple

rates regardless of whether the natural gas provider's energy optimization programs are administered by the provider or an independent energy optimization program administrator . . . .

This provision mandates the use of an RDM in connection with qualified natural gas providers. In contrast, MCL 460.1097(4) provides:

> Not later than 1 year after the effective date of this act, the commission shall submit a report on the potential rate impacts on all classes of customers if the electric providers whose rates are regulated by the commission decouple rates. The report shall be submitted to the standing committees of the senate and house of representatives with primary responsibility for energy and environmental issues. The commission's report shall review whether decoupling would be cost-effective and would reduce the overall consumption of fossil fuels in this state.

This latter provision mandates *research and reporting on how RDMs would operate in connection with providers of electricity*, but does not call for or authorize actual implementation of an RDM by those utilities. At issue, therefore, is whether the PSC is empowered to approve or direct the use of an RDM without specific statutory authorization. We read the statutes to answer this question in the negative.

As with other administrative agencies, the PSC possesses only that authority granted to it by the Legislature. *Attorney General v Pub Serv Comm*, 231 Mich App 76, 78; 585 NW2d 310 (1998). Authority must be granted by clear and unmistakable language, and so the wording in the PSC's enabling statutes must be read narrowly and in the context of the entire statutory scheme. *Consumers Power Co v Pub Serv Comm*, 460 Mich 148, 155-159; 596 NW2d 126 (1999). As this Court recently noted in *Herrick Dist Library v Library of Mich*, 293 Mich App 571, 582; 810 NW2d 110 (2011),

[t]he powers of administrative agencies are . . . inherently limited. Their authority must hew to the line drawn by the Legislature. Our Supreme Court has repeatedly stressed the importance of this limitation on administrative agencies, stating that " '[t]he power and authority to be exercised by boards or commissions must be conferred by clear and unmistakable language, since a doubtful power does not exist.' " *Mason [Co Civic Research Council v Mason Co]*, 343 Mich [313, 326–327; 72 NW2d 292 (1955)] (citation omitted).

It is our judgment that a plain reading of MCL 460.1097(4) does not empower the PSC to approve or direct the use of an RDM for electric providers. If the Michigan Legislature had wanted to do so, it is plain from the language applicable to gas utilities in MCL 460.1089(6) that it could and would have made its intention clear. Accordingly, we reverse the PSC's decision to authorize Detroit Edison to adopt a rate decoupling mechanism because in doing so it exceeded its powers.

#### IV. LOW-INCOME AND ENERGY EFFICIENCY FUND

We further hold that the PSC erred when it ordered that Detroit Edison may include $39,858,000 in funding for the LIEEF as an operation and maintenance expense. This Court ruled in *Mich Consol Gas Application*, 293 Mich App at 368, that the Legislature's

deletion of all references to the LIEEF from the Customer Choice and Electricity Reliability Act[1]—whose now-deleted provisions were recognized as the fund's enabling legislation in the first instance—indicates a legislative intent to withdraw any obligation, or prerogative, on the part of PSC-regulated utilities to raise money for that fund. [Citation omitted.]

---

[1] MCL 460.10 *et seq.*

This Court further held that the PSC's general regulatory powers under MCL 460.6a(2) do not include the authority "to approve of a utility's collecting funds from its ratepayers in general to fund a program designed to offer some protection against interruptions in services, or other such relief, to distressed ratepayers" or to administer "a program to promote energy efficiency in general." *Id.* at 369.

The PSC cites MCL 460.10s to support its argument that the LIEEF remains a going concern. MCL 460.10s provides:

> The commission shall monitor the extent to which federal funds are available for low-income and energy assistance programs. If there is a reduction in the amount of the federal funds available to residents in this state, the commission shall conduct a hearing to determine the amount of funds available and the need, if any, for supplemental funding. Upon completion of the hearing, the commission shall prepare a report and submit it to the governor and the legislature.

This section, added to the Customer Choice and Electricity Reliability Act by 2000 PA 141, establishes the PSC's duty to monitor and evaluate federal funding for LIEEF programs, but neither creates a LIEEF nor even refers to any such fund in existence.

Further, while appropriations for the LIEEF may suggest "the Legislature's intention that the LIEEF continue to exist," the deletion of the enabling legislation indicates an intention to remove any duty or right of Detroit Edison to raise money for this purpose as an operation and maintenance expense. *Mich Consol Gas Application*, 293 Mich App at 368. As the Attorney General argues, "[a] court should not interpret an appropriations act as authorizing an administrative agency to generate money for a fund." This is because

" '[n]o appropriation shall be a mandate to spend.' " *Co Rd Ass'n v Governor*, 474 Mich 11, 15; 705 NW2d 680 (2005), quoting Const 1963, art 5, § 20.

Thus, to the extent that the LIEEF may exist, the deletion of the enabling legislation from MCL 460.10d left the PSC and PSC-regulated utilities without authorization to include revenue for the LIEEF as a cost to be borne by ratepayers, the utility users. Accordingly, we reverse the PSC's order insofar as it approved nearly $40 million in LIEEF funding to come from Detroit Edison's customers.[2]

## V. TRACKING MECHANISMS

We hold that the PSC did not exceed its authority by approving Detroit Edison's use of tracking mechanisms through which future rates are adjusted to take account of actual past expenses.

At issue is the PSC's approval of Detroit Edison's request to extend previously approved trackers for storm and nonstorm restoration expenses and for a line-clearance expense mechanism, to adopt a UETM, and to continue a CIM.

As this Court explained in *In re Application of Mich Consol Gas Co*, "[r]etroactive ratemaking in utility cases is prohibited, absent statutory authorization." *Mich Con-*

---

[2] We note that after this Court released its decision in *Mich Consol Gas Application*, the Michigan Legislature passed legislation to replace the LIEEF with the vulnerable household warmth fund, which will assist low-income customers with their heating bills this winter. MCL 460.9q, as amended by 2011 PA 274. Again, our observation regarding the Legislature's role in making policy with respect to an RDM is equally applicable to the LIEEF. Michigan's Legislature is the appropriate constitutional body to make policy, and it is has now exercised that power in clear and unmistakable language, which thus provides the administrative agency, the PSC, the requisite authority to implement the Legislature's policy directive.

*sol Gas Application*, 293 Mich App at 366, citing *Mich Bell Tel Co v Pub Serv Comm*, 315 Mich 533, 547, 554–555; 24 NW2d 200 (1946). As in *Mich Consol Gas Application*, 293 Mich App at 366, the Attorney General "argues that use of the challenged tracking mechanism runs afoul of that principle." However, "retroactive rate-making does not occur if only future rates are affected, with no adjustment to previously set rates." *Id.*, citing *Attorney General v Pub Serv Comm*, 262 Mich App 649, 655, 658; 686 NW2d 804 (2004).

This Court has approved the PSC's decision to authorize the use of a CIM, along with a tree-trimming/forestry tracker. *In re Application of Consumers Energy Co for Rate Increase*, 291 Mich App 106, 114-115; 804 NW2d 574 (2010). In doing so, this Court reaffirmed the PSC's use of "the accounting convention whereby storm-related expenses dating from one year [are] characterized as expenses incurred in the subsequent years to which they were deferred." *Id.* at 114, citing *Attorney General*, 262 Mich App at 658. In *Mich Consol Gas Application*, 293 Mich App at 366-367, this Court also approved a utility's use of a UETM of the kind at issue here. As noted in that case, this Court has also approved a UETM in connection with another utility in 2008,

> on the ground that 'the UETM, designed to defer . . . the difference between the initially projected and the actual uncollectible expenses for a given period to a future year, does not involve retroactive ratemaking because the deferred expense is deemed an expense of the year to which it is deferred and, thus, is recovered on a prospective basis.' [*Id.*, quoting *In re Application of Mich Consol Gas Co*, 281 Mich App 545, 549; 761 NW2d 482 (2008).]

It is thus well settled that the PSC may authorize the utilities it regulates to use UETMs, appellants' re-

peated challenges notwithstanding. Accordingly, our caselaw confirms that the PSC correctly approved Detroit Edison's use of tracking mechanisms through which future rates are adjusted to take account of actual past expenses.

### VI. ADVANCED METERING INFRASTRUCTURE PROGRAM

We agree with appellants that the PSC erred by approving funding for Detroit Edison's advanced metering infrastructure (AMI) program. The PSC describes AMI as "an information-gathering technology that allows Detroit Edison to collect real-time energy consumption data from its customers." As ABATE explains, "[t]he so-called 'smart meters' allow the utility to remotely monitor and shut-off electricity to customers that have these meters installed." According to ABATE, the intention appears to be to "allow customers to access real time energy consumption data and make alterations in their energy consumption patterns in order to reduce their own costs and to reduce the demands placed upon the system at time of system peak." However, appellants have established that the PSC's decision to approve the nearly $37 million rate increase to fund the program was unreasonable because it was not supported by " 'competent, material, and substantial evidence on the whole record.' " *In re Consumers Energy Co Application*, 279 Mich App 180, 188; 756 NW2d 253 (2008) (citation omitted); see also MCL 24.306(d).

What the record does reveal is that AMI is a pilot program that even Robert Ozar, manager of the Energy Efficiency Section in the Electric Reliability Division of the PSC, concedes "is as yet commercially untested and highly capital intensive, resulting in the potential for significant economic risk and substantial rate impact."

At best, the actual evidence presented by Detroit Edison to support the rate increase was aspirational testimony describing the AMI program in optimistic but speculative terms. What the record sadly lacks is a discussion of competing considerations regarding the program or the necessity of the program and its costs as related to any net benefit to customers.[3] Though Detroit Edison and the PSC urge us to adopt an abuse-of-discretion standard of review because it characterizes AMI as "experimental," we decline to do so. While we appreciate that a cost-benefit analysis for a pilot program may be more difficult to establish with record evidence, this inherent difficulty does not permit the PSC to authorize millions of dollars in rate increases without an informed assessment supported by competent, material, and substantial evidence.

---

[3] We take judicial notice that, on January 12, 2012, the PSC issued an order opening a docket to investigate the use of smart meters by electric utilities in Michigan. Case No. U-17000. The order states that its purpose is to address concerns raised by customers and municipalities and to "increas[e] the Commission's and the public's understanding of smart meters . . . ." To that end, the PSC ordered all regulated electric utilities to provide much the same information we find lacking here, including

> (1) The electric utility's existing plans for the deployment of smart meters in its service territory; (2) The estimated cost of deploying smart meters throughout its service territory and any sources of funding; (3) An estimate of the savings to be achieved by the deployment of smart meters; (4) An explanation of any other non-monetary benefits that might be realized from the deployment of smart meters; (5) Any scientific information known to the electric utility that bears on the safety of the smart meters to be deployed by that utility; (6) An explanation of the type of information that will be gathered by the electric utility through the use of smart meters; (7) An explanation of the steps that the electric utility intends to take to safeguard the privacy of the customer information so gathered; (8) Whether the electric utility intends to allow customers to opt out of having a smart meter; and (9) How the electric utility intends to recover the cost of an opt out program if one will exist.

Moreover, we will not rubber-stamp a decision per-mitting such a substantial expenditure—a cost to be borne by the citizens of this state—that is not properly supported. Were we to do so, we would abdicate our judicial review obligations. Again, the PSC may allow recovery of a utility's costs only when the utility proves that recovery of the costs is just and reasonable. On the record before the PSC and, perforce, before us, the PSC's decision was erroneous. Accordingly, we remand this matter for the PSC to conduct a full hearing on the AMI program, during which it shall consider, among other relevant matters, evidence related to the benefits, usefulness, and potential burdens of the AMI, specific information gleaned from pilot phases of the program regarding costs, operations, and customer response and impact, an assessment of similar programs initiated here or in other states, risks associated with AMI, and projected effects on rates. In other words, a real record, with solid evidence, should support whatever decision the PSC makes on remand.

## VII. PEAK DEMAND

We hold that the PSC correctly reconsidered the question of how to best compute peak demand and elected to return to the system whereby peaks for all twelve months are taken into account.

The Customer Choice and Electricity Reliability Act, as amended by 2008 PA 286, includes the following provision, effective January 1, 2009:

> Except as otherwise provided in this subsection, the commission shall phase in electric rates equal to the cost of providing service to each customer class over a period of 5 years from the effective date of the amendatory act that added this section. . . . The cost of providing service to each customer class shall be based on the allocation of

production-related and transmission costs based on using the 50-25-25 method of cost allocation. The commission may modify this method to better ensure rates are equal to the cost of service if this method does not result in a greater amount of production-related and transmission costs allocated to primary customers. [MCL 460.11(1).]

The PSC reported that in Detroit Edison's most recent general rate case, all parties agreed that "the allocation formula mandated by the Legislature should be understood to consist of a 50% weighting of peak demand, a 25% weighting of on-peak energy use, and a 25% weighting of total energy use." The PSC further noted that the statute does not specify the peak-demand component, and that the statute has the effect of shifting the weighting of peak demand halfway back to where it had been before 2005. At issue is the PSC's decision to change the method of calculating peak demand from "MH4CP" to a method used before, "12CP."

"MH4CP" stands for "multihour 4 coincident peak" and is based on peak demands in the four months typically bringing greatest energy usage, June through September. The PSC described it as using "a multi-hour approach, which looks at a seven-hour time period, from 1:00 p.m. to 8:00 p.m., on the peak day of each summer month." In contrast, "12CP" stands for "twelve coincident peaks". The PSC described this as using "the peak hour from each month of the year."

ABATE states that the MH4CP method of calculating peak demand was in place when the Legislature prescribed the 50-25-25 formula and that the Legislature should thus be presumed to have intended that that component remain the operative one for that purpose. The PSC argues that the 12CP method had been used without incident in various earlier years and

that the absence of any such specification in MCL 460.11(1) left the peak-demand component to the PSC's discretion.

We agree with the PSC. "The court is not at liberty to read into the statute provisions which the legislature did not see fit to incorporate, nor may it enlarge the scope of its provisions by an unwarranted interpretation of the language used." *Ford Motor Co v Unemployment Compensation Comm*, 316 Mich 468, 473; 25 NW2d 586 (1947). Accordingly, the statute in question should be read with the understanding that the Legislature intended the specificity where it was specific and the silence where it was silent. See *AFSCME v Detroit*, 468 Mich 388, 400; 662 NW2d 695 (2003) ("[W]e may not read into the statute what is not within the Legislature's intent as derived from the language of the statute."). That the Legislature specified the 50-25-25 weighting formula in connection with what was understood to be, respectively, peak demand, on-peak energy use, and total energy use while keeping silent about how any of those components would be determined, should thus be taken to indicate that the Legislature intended to prescribe the 50-25-25 formula while leaving the PSC and the utilities it regulates to determine such components as 12CP or MH4CP in the normal course of business. Accordingly, the statute's provision for modification of "this method" refers to the 50-25-25 formula, and the PSC need not rely on that language to justify its decision to change from the MH4CP to the 12CP methodology. For these reasons, we affirm the PSC's decision to use the 12CP component in this instance.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

BECKERING, J., concurred with SAAD, J.

SHAPIRO, P.J. (*concurring in part and dissenting in part*). I concur with the majority that the Public Service Commission's decision to allow rate decoupling should be reversed because the issue is plainly controlled by the Legislature's recent adoption of MCL 460.1089(6) and MCL 460.1097(4). These sections set forth the scope of the commission's authority specifically with respect to rate decoupling and clearly limit that authority, regardless of what its scope was before their passage. Thus, the statutes determine the outcome of this issue, and the extent of the commission's general authority as it existed before the adoption of these controlling provisions is not relevant to our decision.

I dissent from the majority's reversal of the PSC's approval of the advanced metering infrastructure program. Because this is an experimental program and because the commission's action was not arbitrary or capricious, we are bound to affirm. The majority states that it "declines to adopt" the arbitrary-and-capricious standard of review with respect to PSC authorization of experimental programs. However, that is in fact the standard. *Residential Ratepayer Consortium v Pub Serv Comm*, 239 Mich App 1, 5; 607 NW2d 391 (1999). The majority does not conclude, and I do not believe we can conclude, that the PSC's approval of the pilot program was arbitrary and capricious in light of the testimony of Detroit Edison's manager of systems operations and that of the manager of the Energy Efficiency Section of the Electric Reliability Division of the commission. As noted in *Residential Ratepayer*, experimental rates " 'by their very nature . . . must await results on a test basis' . . . ." *Id.* (citation omitted). I believe that the majority is putting the cart before the horse by requir-

ing that the commission conduct a full hearing on the results of the experimental program before the program has been conducted.

Moreover, it is not disputed that this issue was raised in an earlier case involving these parties, decided in the PSC's favor and not pursued by appellants to a decision by this Court.[1] While the doctrines of res judicata and collateral estoppel do not apply "in the pure sense" in ratemaking cases, "issues fully decided in earlier PSC proceedings need not be 'completely relitigated' in later proceedings unless the party wishing to do so establishes by new evidence or a showing of changed circumstances that the earlier result is unreasonable." *In re Application of Consumers Energy Co For Rate Increase*, 291 Mich App 106, 122; 804 NW2d 574 (2010), quoting *Pennwalt Corp v Pub Serv Comm*, 166 Mich App 1, 9; 420 NW2d 156 (1988). As appellants identify no new evidence or changed circumstances, I would defer to the earlier ruling.

I concur with the majority in all other respects.

---

[1] See Public Service Commission Case No. U-15768, January 11, 2010, opinion and order, p 55, citing Public Service Commission Case No. U-15244, December 23, 2008, opinion and order, appeal dismissed by stipulation in *In re Application of Detroit Edison Co to Increase Rates*, unpublished order of the Court of Appeals, entered February 22, 2010 (Docket No. 291226).