# STATE OF MICHIGAN

# COURT OF APPEALS

---

In re Application of INDIANA MICHIGAN POWER
COMPANY to Reconcile Costs.

---

INDIANA MICHIGAN POWER COMPANY,

      Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,

      Appellee.

UNPUBLISHED
November 29, 2016

No. 326405
MPSC
LC No. 00-017283

---

In re Application of INDIANA MICHIGAN
POWER COMPANY to Reconcile Costs.

---

INDIANA MICHIGAN POWER COMPANY,

      Petitioner-Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,

      Appellee.

No. 327716
MPSC
LC No. 00-017603

---

Before: RONAYNE KRAUSE, P.J., and O'CONNELL and GLEICHER, JJ.

PER CURIAM.

In these consolidated appeals, appellant Indiana Michigan Power Company (I&M) appeals from orders entered on September 26, 2014, and May 14, 2015, by the Michigan Public Service Commission (PSC) denying I&M's request to reconcile net lost revenues for the 12-month period ending December 31, 2012, and approving I&M's request to reconcile its energy optimization revenues and expenses for 2013, respectively. For the reasons discussed below, we

-1-

remand these cases for reconsideration in light of *Enbridge Energy Ltd P'ship v Upper Peninsula Power Co*, 313 Mich App 669; 884 NW2d 581 (2015).

## I.  BACKGROUND

On January 27, 2010, I&M filed a general rate case application.  The application, which was docketed as Case No. U-16180, relied on a 2010 test year, sought a revenue increase of $62.5 million, and included proposals for several rate adjustment mechanisms to track and align costs and rates, including a Net Lost Revenue Recovery Tracker (NLRT).  On October 14, 2010, the PSC entered an order approving the parties' settlement agreement and a rate increase of $35 million.  Paragraph 15k of the settlement agreement provided:

> The Company requested a pilot Energy Optimization (EO) decoupler that limits recovery to lost sales resulting from I&M's EO plan approved in U-15808.  I&M's Net Lost Revenues will be recovered through a surcharge mechanism as discussed in the direct testimony of Staff witness Morgan and as modified in the rebuttal testimony of Company witness Roush.  When calculating I&M's Net Lost Revenues for 2011, I&M will use one-half the certified EO savings reflected in I&M's 2010 sales forecast and one-half of its certified EO savings for 2011.  The Company will be authorized to create a regulatory asset for the Net Lost Revenues effective January 1, 2011 to be recovered through the Net Lost Revenue Recovery Surcharge.  The Company shall file an annual reconciliation of any over or under recovery of the Net Lost Revenue Recovery Surcharge coincident with Energy Optimization Annual Report/Reconciliation—no later than April 30th of each year.  Since EO savings are cumulative, future EO reconciliations should reflect one-half of the certified EO savings for 2010 and 2011.

I&M filed an application in its EO plan reconciliation on April 29, 2011.  The application was docketed as Case No. U-16311.  I&M requested authority to reconcile its EO plan costs, and also requested that in accordance with the approved Settlement Agreement in Case No. U-16180, it be authorized to recover Net Lost Revenues as reflected in the updated EO billing factors.

While the application in Case No. U-16311 was pending I&M filed a general rate case on July 1, 2011.  The rate case was docketed as Case No. U-16801.  I&M relied on a 2012 test year and requested a rate increase of $24.5 million, noting that its existing rates were established in the approved Settlement Agreement in Case No. U-16180.  I&M sought approval of "proposed changes to its terms and conditions for services as well as its proposed rate adjustment mechanisms."  The application made no specific reference to the NLRT approved in Case No. U-16180.

The PSC issued an order on January 12, 2012, approving a Settlement Agreement in Case No. U-16311.  The Settlement Agreement provided in pertinent part:

> The parties agree to defer to I&M's filing in 2012 all issues concerning I&M's proposed mechanism to recover lost power supply and distribution revenues, as authorized in paragraph 15.k. of the Settlement Agreement in Case No. U-16180.

On February 15, 2012, the PSC approved a Settlement Agreement in Case No. 16801. The order approved a rate increase for I&M in the amount of $14.6 million. Neither the PSC order nor the parties' Settlement Agreement made reference to the NLRT approved in Case No. U-16180.

On April 10, 2012, this Court released its decision in *In re Application of Detroit Edison Co*, 296 Mich App 101; 817 NW2d 630 (2012). In that case, Detroit Edison requested authority to realign electric rates for certain institutional customers and, among other things, to use a revenue decoupling mechanism (RDM).[1] The PSC issued an order allowing Detroit Edison to adopt an RDM. This Court reversed this portion of the PSC's order, holding that pursuant to MCL 460.1089(6), the PSC had authority to approve the use of an RDM for gas utilities, but not electric utilities. *Id*. at 108-110.

On April 27, 2012, I&M filed an application, docketed as Case No. U-16739, seeking authority to reconcile EO revenues and expenses for 2011, and to recover net lost revenues of $1,137,616. I&M sought to recover the NLT through the implementation of an NLRT, which I&M asserted was both consistent with other NLRTs approved by the PSC and distinguishable from the RDM that the PSC disallowed in *In re Application of Detroit Edison Co*.

## II. FACTS AND PROCEEDINGS IN UNDERLYING CASES

### A. Docket No. 326405

On April 30, 2013, I&M filed an application, docketed as Case No. U-17283, requesting that the PSC "commence an Energy Optimization (EO) Plan Cost Reconciliation proceeding for the period ended December 31, 2012 and approve [I&M's] reconciliation of Certified Net Lost Revenues (CNLR) resulting from the EO plan." On December 19, 2013, the PSC issued an order approving a partial Settlement Agreement. The Settlement Agreement provided in pertinent part:

> 4. Subsequent to the prehearing conference, the parties have engaged in audit procedures and settlement discussions and, as a result, have reached agreement on the following issues in this case. The parties to this Partial Settlement Agreement agree as follows:
>
> a. The 2012 payments for electric and gas totaled $4,420,319 to the Independent Energy Optimization Program Administrator satisfy the payment requirements set forth in MCL 460.1091(1).

---

[1] A revenue decoupling mechanism is a "mechanism that adjusts for sales volumes that are above or below the projected levels that were used to determine the revenue requirement authorized in the natural gas provider's most recent rate case. In determining the symmetrical revenue decoupling true-up mechanism utilized for each provider, the commission shall give deference to the proposed mechanism submitted by the provider." MCL 460.1089(6).

b. The proposed reconciliation of 2012 Energy Optimization revenues and payments should be approved and results in a net under-recovery of $710,067 (including interest) through December 31, 2012. The total net under-recovery of $903,516 includes $193,449 of the 2011 under-recovery and should be reflected as the beginning balance of I&M's 2013 Energy Optimization costs and reconciliation.

c. The proposed revised Energy Optimization surcharges incorporated into the tariff sheets attached hereto as Attachment 1 should be approved for bills beginning with the first billing cycle of January 2014 or the first billing cycle in the month following a Commission order.

5. The parties reserve the right to address in briefs all other issues raised by I&M's testimony and exhibits but not resolved by this Partial Settlement Agreement. Specifically, the parties intend to address in brief issues arising from I&M's proposals related to the Net Lost Revenue Tracker in this case.

The Proposal for Decision (PFD) concluded that I&M's NLRT terminated when new rates were approved in Case No. U-16801, and stated:

Contrary to I&M's arguments, the cumulative nature of the reconciliation calculations in which sales reductions (savings) in one year are carried forward into future years, does not mean that the mechanism was intended to apply to rates set in future rate cases. Instead, the provision that Energy Optimization savings are cumulative and thus future period reconciliations should reflect prior period savings also shows that the mechanism is intrinsically linked to the rate case in which it was authorized, because the savings are calculated with reference to the sales level established in that case.

Although the settlement agreement refers to future reconciliations, i.e. indicating that reconciliations were expected for more than just one year, this also does not mean that the mechanism was intended to apply once base rates were revised.

The PFD rejected I&M's argument that the Staff's contention that the NLRT did not survive beyond Case No. U-16180 constituted a collateral attack on the Settlement Agreements entered in Case Nos. U-16180, U-16311, U-16379, and U-16801, and concluded that the NLRT established in Case No. U-16180 did not exist independently from the rates established in that case.

The PFD also contained the following relevant statement:

As discussed in section II above, the parties also disagree whether the Commission could have approved the pilot decoupling mechanism of Net Lost Revenue Tracker in Case No. U-16801, based on the Court of Appeals rulings that the Commission does not have authority to approve a revenue decoupling mechanism. This PFD finds that it is not necessary to resolve the dispute whether the Net Lost Revenue Tracker is truly a revenue decoupling mechanism covered

by the Court's rulings. As I&M argues, the decision in the first of these cases, *In re Application of Detroit Edison Co*, 296 Mich App 101 (2012), was not issued until April 10, 2012. By that point, Case No. U-16801 had been resolved by settlement agreement, with a final Commission order issued February 15, 2012. Had the parties agreed to include a Net Lost Revenue Tracker in that settlement agreement, it would have been presumptively lawful, consistent with the Commission's August 14, 2013 decision in Case No. U-16990.

The PSC entered an order on September 26, 2014, adopting the findings and conclusions set out in the PFD. The order concluded as follows:

> The Commission finds the PFD well-reasoned and adopts its findings and conclusions as discussed below. First, the Commission agrees that the NLRT is indeed linked to the sales approved in the rate case. I&M admitted as much when Mr. Yontz testified that while the method from Case No. U-16180 was used in calculating the lost revenues for 2012 and 2013, the revised sales from Case No. U-16801 were used in the calculation. More importantly, because these lost sales are cumulative, and past losses are apparently used to adjust the sales projection in the next rate proceeding, it is essential that the company provide some explanation of how these accumulated losses were accounted for, so that other parties might have an opportunity to evaluate and audit the changes in sales due to past EO efforts. In I&M's case, this accounting did not occur because the company did not include any discussion of the NLRT in its filing in Case No. U-16801.

> I&M argues that pursuant to MCL 462.25 and MCL 460.57, any rate, fare, charge, tariff, or rate schedule remains effective until the Commission affirmatively terminates it. In addition, I&M cites the November 9, 2009 order in Case No. U-15645 as a recent example where the Commission explicitly ended the CIM for Consumers Energy Company. I&M points out that, in contrast, the Commission did not affirmatively end the NLRT when it approved the settlement agreement in Case No. U-16801. Therefore, according to I&M, the NLRT continued after new rates were approved in that case.

> There are several problems with this argument. First, MCL 462.25 and MCL 460.57 refer to rates, fares, charges, tariffs, and the like, but the NLRT is merely a mechanism for calculating a particular charge. The actual charge associated with the NLRT is the surcharge that was approved in Case No. U-16739, related solely to the settlement agreement in Case No. U-16180, which has in fact continued because the Commission has not affirmatively ended the charge. Second, past trackers including forestry, uncollectibles, the CIM and various RDMs have consistently been raised by the applicants in subsequent rate proceedings, especially when the applicant seeks to continue the tracker. While I&M points to cases where trackers were contested and expressly terminated, it can point to no cases, and indeed the Commission is unaware of any, where a tracker (many of which began as pilots that were adjusted or refined in later cases) was automatically continued when it was not at least raised by the applicant in a

-5-

subsequent rate proceeding. If, as I&M asserts, the NLRT is indeed a vital ratemaking mechanism, it was incumbent on the company (not the Staff or intervenors) to ensure that the mechanism was addressed in any subsequent general proceeding.

The PSC denied I&M's request to reconcile certified net lost revenues for the 12-month period ending December 31, 2012, ended the surcharge for net lost revenues approved in the order entered on December 20, 2012, Case No. U-16739, and ordered I&M to file a reconciliation of revenues collected under the surcharge established in Case No. U-16739.

## B. Docket No. 327716

On April 30, 2014, I&M filed an application, docketed as Case No. U-17603, seeking approval of its EO reconciliation of costs for the 12-month period ending December 31, 2013, and requesting approval of an NLRT surcharge.

The PFD noted that the parties agreed that I&M's EO reconciliation, which showed an EO underrecovery of $261,083, plus interest, for 2013 should be approved. In response to I&M's argument that the PSC's September 26, 2014, order was wrongly decided, the PFD stated:

> Further, based on a review of the record and the briefs of the parties, this PFD concludes that the proper disposition of I&M's CNLPR surcharge request is controlled by the Commission's September 26, 2014 and February 12, 2015 orders in Case No. U-17283. In that case, the Commission found that I&M's Net Lost Revenue tracking mechanism was not continued when rates were revised in Case No. U-16801. I&M sought rehearing of the Commission's decision in Case No. U-17283. In its February 12, 2015 order in that docket, the Commission rejected I&M's request for rehearing. I&M has not presented new arguments in this case that were not presented to the Commission in its rehearing request, including its argument that the Commission's September 26, 2014 order was wrongly decided, that I&M acted in good faith, that public policy favors revenue decoupling mechanisms to encourage energy efficiency, and that the Commission's order works a hardship on I&M. Thus, although I&M claims this case raises new issues not raised in Case No. U-17283, this PFD does not find support for I&M's position. On this basis, this PFD recommends that the Commission reject I&M's proposed CNLR surcharge.

The PSC entered an order on May 14, 2015, adopting the findings and conclusions set out in the PFD. The PSC noted that the NLRT was approved in Case No. U-16180, and concluded:

> Subsequently, in April 2011, in Case No. U-16311, an EO reconciliation case, I&M filed a request to implement a NLRT surcharge in accordance with approvals in the October 14 order. In the settlement in that case, the parties apparently agreed to defer the surcharge until a later reconciliation. While Case No. U-16311 was pending, I&M filed another rate case, Case No. U-16801. I&M did not request any trackers in that case and, significantly did not mention or

discuss the NLRT in its application or prefiled testimony. As such no party was given an opportunity to assess the efficacy of the NLRT or make any modifications to the tracker, as is very often done with pilot mechanisms. Case No. U-16801 was also settled, this time with no mention of the NLRT. The settlement agreement was approved in an order issued on February 15, 2012. That order did not authorize I&M to implement, or continue, the NLRT. As the Commission has repeatedly explained, I&M's failure to request authority to continue the NLRT in the rate case subsequent to the case where the mechanism was initially approved was fatal to its claims in Case No. U-17283 and to those in the instant proceeding.

I&M appealed the PSC's September 26, 2014, and May 14, 2015, orders. This Court consolidated the appeals for purposes of hearing and decision.

## III. Standard of Review

The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). An order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Pub Serv Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Pub Serv Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987).

A reviewing court gives due deference to the PSC's administrative expertise, and is not to substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). We give respectful consideration to the PSC's construction of a statute that the PSC is empowered to execute, and we will not overrule that construction absent cogent reasons. If the language of a statute is vague or obscure, the PSC's construction serves as an aid to determining the legislative intent, and will be given weight if it does not conflict with the language of the statute or the purpose of the Legislature. However, the construction given to a statute by the PSC is not binding on us. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103-109; 754 NW2d 259 (2008). Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

## IV. Analysis

On appeal, I&M argues that the PSC erred by finding that the NLRT approved in Case No. U-16180, i.e., the first general rate case, was terminated because I&M did not raise its

applicability in Case No. U-16801, i.e., the second general rate case. The PSC's past practice showed that a tracker such as the NLRT continued absent an agreement by the parties or a directive from the PSC to terminate it. I&M relied on this past practice and so omitted reference to the NLRT in its application in the second general rate case. Under the circumstances, the PSC is equitably estopped from taking the position that the NLRT terminated upon the implementation of new rates in the second general rate case. I&M also argues that the PSC's decision to terminate the NLRT deprived it of approximately $4.475 million in revenue it would have collected if the PSC had left the NLRT in place, and it of the right to fair and just treatment guaranteed by the Michigan Constitution. Const 1963, art 1, § 17.

We hold that these cases must be remanded for reconsideration in light of *Enbridge Energy Ltd P'ship v Upper Peninsula Power Co*, 313 Mich App 669; 884 NW2d 581 (2015).

As noted above, in *In re Application of Detroit Edison*, this Court held that the PSC lacked the statutory authority to approve the use of an RDM by an electric utility because MCL 460.1089(6) authorized the use of an RDM by a gas utility only. *In re Application of Detroit Edison*, 296 Mich App at 108-110.

In *Enbridge Energy*, this Court considered the question whether the PSC had the statutory authority to approve a settlement agreement that provided for the use of an RDM by an electric utility. In that case, the Upper Peninsula Power Company (UPPC) filed an application in June 2009 seeking a rate increase. The UPPC and other parties, including the PSC Staff, entered into a settlement agreement that granted UPPC a rate increase and implemented an RDM for the test year 2010. *Enbridge Energy*, 313 Mich App at 671. In May 2011, UPPC filed an application for reconciliation of costs associated with the RDM and to recover a shortfall in revenues. While that application was pending, this Court decided *In re Application of Detroit Edison*. Notwithstanding this Court's decision in *In re Application of Detroit Edison*, the PSC concluded that the RDM agreed to by UPPC and other parties could stand because it merely had to comply with the settlement agreement, and that it had the authority to approve the settlement agreement. Enbridge filed a formal complaint arguing that the PSC lacked the authority to approve the use of an RDM by an electric utility. The PSC rejected that argument and dismissed the complaint. *Id*. at 671-673.

In *Enbridge Energy*, this Court reversed the PSC's decision, holding that the PSC exceeded its statutory authority by approving the underlying settlement agreement and dismissing Enbridge's complaint. The *Enbridge Energy* Court emphasized that while MCL 460.1089(6) authorized the PSC to approve the use of an RDM by gas utilities, no corresponding statute authorized the PSC to approve the use of an RDM by an electric utility. The PSC held that the fact that the RDM at issue was approved in the context of a settlement agreement was not dispositive. *Enbridge Energy*, 313 Mich App at 675-677. The *Enbridge Energy* Court concluded:

> In sum, the PSC exceeded its clear statutory authority when it approved the RDM in Case No. U-16568. The fact that the approval was accomplished in the context of a settlement agreement does not transform the PSC's ultra vires act into a legal one. See, e.g., *Timney v Lin*, 106 Cal App 4th 1121, 1127-1129; 131 Cal Rptr 2d 387 (Cal App, 2003) ("[E]ven though there is a strong public policy

favoring the settlement of litigation, this policy does not excuse a contractual clause that s otherwise illegal or unjust."). We stress that our holding is based on the fact that reasonable minds could not have disputed the extent of the PSC's authority at the time it approved the settlement agreement. [*Enbridge Energy*, 313 Mich App at 678.]

I&M argues that *Enbridge Energy* is inapplicable because the NLRT is distinguishable from the RDM found void in *Enbridge Energy*. I&M notes that a PSC Staff witness stated that the NLRT was more limited in scope than other mechanisms approved by the PSC and focused on lost revenues.

We remand these cases to the PSC for reconsideration in light of *Enbridge Energy*. The PSC has "only that authority granted to it by the Legislature." *Mich Elec Coop Ass'n v Pub Serv Comm*, 267 Mich App 608, 616; 705 NW2d 709 (2005). No statutory authority allows the PSC to approve an RDM for an electric utility. *In re Application of Detroit Edison*, 296 Mich App at 108-110. The relevant question, then, is whether the definition of an RDM is sufficiently expansive to include the NLRT approved in Case No. U-16180.

The issue whether the NLRT is factually distinct from RDMs approved by the PSC in other cases requires analysis of the specific structure of the NLRT and comparison of that structure to RDMs approved by the PSC. The performance of such an analysis is more suited to the PSC in the first instance. We defer to the administrative expertise of the PSC. *Attorney General*, 237 Mich App at 88. Moreover, it is apparent that the PSC approves a number of RDMs and similar mechanisms. To have the PSC rule on the validity of the NLRT in light of *Enbridge Energy* would provide guidance for future cases.

Whether these cases continue is entirely dependent on the applicability of *Enbridge Energy*. Therefore, an analysis of the issues raised by I&M is premature.

## V. CONCLUSION

We conclude that analysis of the issues raised by I&M is premature in light of *Enbridge Energy* and remand these matters to the PSC for reconsideration in light of that case. We do not retain jurisdiction.

/s/ Amy Ronayne Krause
/s/ Peter D. O'Connell
/s/ Elizabeth L. Gleicher